IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SANTONIO DEMON MURFF,           §
                 Petitioner,    §
                                §
v.                              §        Civil Action No. 4:16-CV-346-O
                                §
LORIE DAVIS, Director,          §
Texas Department of Criminal Justice,  §
Correctional Institutions Division,    §
                 Respondent.    §

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed

by Petitioner, Santonio Demon Murff, a state prisoner confined in the Correctional Institutions

Division of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, director of

TDCJ, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has

concluded that the petition should be denied.

## I. BACKGROUND

On December 20, 1996, in the 371st District Court, Tarrant County, Texas, a jury found

Petitioner guilty of capital murder, and, the state having waived the death penalty, the trial court

assessed a mandatory life sentence. Tr. 195, ECF No. 14-4. Petitioner appealed his conviction, but

the Second District Court of Appeals of Texas affirmed the trial court's judgment. Docket Sheet 2,

ECF No. 14-2. Thereafter, Petitioner filed three state habeas-corpus applications. The first, filed in

July 2004, was dismissed for noncompliance with the state's form requirements on August 25, 2004.

SH01 Writ Action Taken & 2, ECF No. 14-19. The second, filed in September 2004, was granted

in part, allowing Petitioner to file an out-of-time petition for discretionary review, which the Texas

Court of Criminal Appeals refused on September 10, 2008. SH03 Writ 2 & Action Taken, ECF No.

15-1; Docket Sheet 1-2, doc. 14-2. The third, filed in January 2009, was denied by the Texas Court

of Appeals on October 7, 2015, without written order on the findings of the trial court after a hearing.

SH04 Writ 2 & Action Taken, ECF Nos. 15-2, 15-8.

The state appellate court briefly summarized the evidence as follows:

> [Petitioner] killed Robert Phelan by shooting him three times with a .380 caliber, semi-automatic pistol. Both before and after he shot Phelan, [Petitioner] took several items that belonged to Phelan's roommate. [Petitioner] later told a friend that he and a co-conspirator [Marcus Johnson] put a gun to Phelan's head, took what they wanted of his roommate's property, and then killed Phelan.

Op. 2-3, ECF No. 14-3. There was also evidence that Petitioner was a member of the West Side

Rolling 60's Crip gang and was engaged in drug dealing and other criminal activities at the time of

the murder. Reporter's R., vol. 6, 225, 239, 306, 313, ECF No. 14-9.

## II. ISSUES

In this federal habeas-corpus petition, Petitioner grounds for relief fall within two general

categories: (1) laches and ineffective assistance of trial counsel (grounds one , two, and four through

seven) and (2) denial of Petitioner's motion for continuance (ground three). Pet. 6-7, 11-12, ECF No.

3.

## III. RULE 5 STATEMENT

Respondent asserts that Petitioner's ineffective-assistance-of-counsel claims, which were

barred by laches in his third state habeas proceeding, are procedurally barred from the Court's review

under the procedural default doctrine. Resp't's Answer 25-26, ECF No. 18. Otherwise, she does not

believe that Petitioner's claims are unexhausted or that the petition is successive for purposes of §

2244(b) or barred by limitations under § 2244(d).

## IV. PROCEDURAL DEFAULT

Petitioner raised his ineffective-assistance-of-counsel claims in all three of his state habeas applications. The state habeas court set out the procedural history of the postconviction proceedings in his case as follows:

4.    [Petitioner] appealed his conviction.

5.    The Second Court of Appeals affirmed [Petitioner]'s conviction on January 15, 1998.

6.    Mandate was issued on March 26, 1998.

7.    [Petitioner] filed his first application for writ of habeas corpus on July 19, 2004.

8.    [Petitioner]'s first application was dismissed for non-compliance on August 25, 2004.

9.    [Petitioner]'s first application was filed over six years after mandate issued.

10.   [Petitioner]'s second application was filed on September 22, 2004.

11.   Hon. Sylvia Andrews filed her first affidavit on July 18, 2005.

12.   [Petitioner]'s second application for writ of habeas corpus was partially granted and he was granted an out-of-time petition for discretionary review.

13.   [Petitioner]'s petition for discretionary review was refused on October 6, 2008.

14.   [Petitioner] filed this third application for writ of habeas corpus on January 15, 2009.

15.   The trial court ordered another affidavit from Hon. Andrews on February 3, 2009.

16.   On March 13, 2009, the State requested a sixty day extension on the behalf of Hon. Andrews for her to file her affidavit due to a difficulty in contacting her.

17.   On August 2, 2010, this Court appointed Hon. Bob Ford to represent [Petitioner] and procure an affidavit from Hon. Sylvia Andrews.

18. On October 1, 2010, Hon. Andrews filed her second affidavit.

19. This Court has personal knowledge that the State proceeded to try and get a supplemental affidavit from Hon. Andrews from October, 2010 until August, 2012.

20. After the untimely death of Hon. Bob Ford in late 2011, Hon. Scott Brown was appointed to represent [Petitioner].

21. On August 6, 2012, the State requested a hearing to give Hon. Andrews an opportunity to testify and explain her representation because it felt her affidavits did not adequately address the issues.

22. A hearing was held in this proceeding on January 24, 2013.

23. The reporter's record of the hearing was filed on May 17, 2013.

State Writ (part 2) 328-29, ECF No. 15-9 (record citations omitted).

Clearly, Petitioner's ineffective-assistance claims were not considered by the state courts in his first state habeas application, which was dismissed for noncompliance with the form requirements; the claims were dismissed as premature in his second application; and the claims were barred by laches in his third application. SH03 362, ECF No. 15-9.

Under the procedural default doctrine, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler,* 558 U.S. 53, 55 (2009) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)). The state-law ground may be a substantive rule dispositive of the case or a procedural barrier to adjudication of the claim on the merits. *See Walker v. Martin,* 562 U.S. 307, 315 (2011) (citing *Wainwright v. Sykes,* 433 U.S. 72, 81-82 (1977)). To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." *Id.* at 316 (quoting *Kindler,* 558 U.S. at 60). A discretionary

state procedural rule "can serve as an adequate ground to bar federal habeas review." *Id.*

Under his second ground, Petitioner claims that the state habeas court's factual findings and legal conclusions adopting the doctrine of laches are "both contrary to and unreasonable as set out under" § 2254(d)(1) and (2). Petitioner was represented at trial by Sylvia Andrews. The state habeas judge, who conducted the hearing on Petitioner's ineffective-assistance claims in January 2013, entered the following relevant factual findings on the issue:

24.    Hon. Andrews' 2005 affidavit contained a lot of errors regarding the underlying facts of this offense.

25.    Before preparing her two affidavits, Hon. Andrews had not read the record, clerk's file, her file, or the investigator's file and were based completely on her near decade old memory.

26.    Hon. Andrews' 2005 affidavit is evidence that she had already begun forgetting specific details of her representation of [Petitioner] in 1996.

27.    Hon. Andrews' 2005 affidavit is evidence that the State was prejudiced by [Petitioner] waiting over eight years to file a proper application due to Hon. Andrews' diminished memory.

SH10 Writ 327-28, ECF No. 15-8 (record citations omitted).

Based on her findings, and relying solely on state law, the judge entered the following legal conclusions in barring the claims:

3.    The doctrine of laches may be employed in a Court's determination of whether to grant relief in any given 11.07 case.

4.    The State is no longer required to make a particularized showing of prejudice for a writ claim to be barred by laches.

5.    A court may consider anything that places the State in a less-favorable position, including their ability to re-try a case, in determining whether an applicant's delay has prejudiced the State's ability to respond to his claims.

6.    Trial courts may consider the diminished memory of trial participants and the

diminished availability of the State's evidence as well as afford adequate weight to the State's broad interest in the finality of a long-standing conviction.

7.      While the [Texas] Court of Criminal Appeals has declined to set a specific time period for applying the laches doctrine, claims made more than five years after a conviction becomes final demonstrates material prejudice.

8.      The State has been prejudiced by [Petitioner]'s six year delay in bringing this writ application due to diminished memory regarding this case.

*Id.* at 362 (citations omitted).

The Texas Court of Criminal Appeals, adopting the trial court's findings, denied relief. Thus, the state courts' decision rests on an independent and adequate state rule. *See Walker,* 562 U.S. at 317 (holding California's discretionary time rule is an independent and adequate state bar preventing federal habeas review); *Kelley v. Zoeller,* 800 F.3d 318, 327 (7th Cir. 2015) (claim barred by laches is an independent and adequate state law ground preventing federal habeas review); *Smith v. Addison,* 373 Fed. App'x 886, 2010 WL 1544366 at *2 (10th Cir. Apr. 20, 2010) (same). The Court finds no precedent established by the United States Supreme Court prohibiting states from applying the common law doctrine of laches in state habeas proceedings. Furthermore, counsel's affidavits and testimony at the evidentiary hearing establish that counsel had diminished memories of the events surrounding her representation of Petitioner such that the state incurred a disadvantage in responding to Petitioner's ineffective-assistance claims. Thus, this Court cannot conclude that the state courts' findings and legal conclusions on the issue were unreasonable. Petitioner is not entitled to relief under his second ground.

A habeas petitioner may overcome a state procedural bar by demonstrating either cause and actual prejudice for the default or a showing that he is actually innocent of the crime for which he

stands convicted. *See Sawyer v. Whitley,* 505 U.S. 333, 338 (1992)*; Ylst v. Nunnemaker,* 501 U.S. 797, 801-07 (1991); *Smith v. Johnson,* 216 F.3d 521, 523-24 (5th Cir. 2000). "Cause" can be established by showing that "some objective factor external" to the petitioner, something that cannot fairly be attributed to him, prevented him from properly raising the claim(s) in state court. *McClesky v. Zant,* 499 U.S. 467, 493 (1991) (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1980)).

Toward that end, Petitioner asserts that his ineffective-assistance claims should not be procedurally barred from federal habeas review because

> [i]t was conclusively determined at the habeas hearing on January 24, 2013, that Petitioner was never notified by appellate counsel that mandate was issued and he could file a P.D.R. On January 8, 2008, [the state habeas judge] dismissed Petitioner's [second] writ as premature and granted him the right to file an out of time appeal. He quickly did and it was denied. He quickly filed his [third] writ and years were spent trying to get adequate affidavits from trial counsel before the state requested the 2013 hearing. Petitioner did not sleep on his rights. All delays were due to the state and ineffective counsels. If the state felt prejudiced, then the Petitioner should have been ordered a new trial instead of an out of time appeal.

Pet. 6, ECF No. 3.

Assuming, without deciding, that the extreme delays in the state courts and difficulty obtaining affidavits from counsel constitute cause to excuse Petitioner's procedural default, he cannot demonstrate prejudice therefrom. Petitioner had no counsel in his initial state habeas proceeding, thus the rule in *Martinez/Trevino* may excuse his procedural default of the claims if he can demonstrate that the claim is "substantial." For an ineffective-assistance claim to be substantial, a petitioner "must demonstrate that the claim has some merit." *Martinez v. Ryan,* 566 U.S. 1, 14 (2012); *Trevino v. Thaler,* 569 U.S. 413, 429 (2013). Conversely, an "insubstantial" claim is one that "does not have any merit" or that is "wholly without factual support." *Id.* at 16.

Under the familiar *Strickland* standard, to establish ineffective assistance of counsel a

petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

Petitioner claims that his trial counsel was ineffective by—

- failing to challenge three jurors for cause (ground one);
- failing to request an accomplice witness instruction (ground four);
- failing to request an extraneous offense instruction (ground five); and
- failing to object to admission of heresay statements of codefendant Marcus Johnson admitted through Detective Thomas Lenoir's testimony (ground six).

He also claims the cumulative effect of counsel's omissions rendered his trial fundamentally unfair (ground seven). Pet. 6-7, 11-12, ECF No. 3; Pet'r's Mem. 17, ECF No. 4. Notwithstanding the laches bar, the state habeas court entered findings of fact and conclusions of law applying the *Strickland* standard to Petitioner's claims and the Texas Court of Criminal Appeals adopted those findings in denying relief. Petitioner fails to rebut the presumptive correctness of the states' factual findings with clear and convincing evidence; thus, we apply the presumption of correctness to those findings in considering Petitioner's claims.

Counsel responded to Petitioner's claims in two affidavits filed in state court. In the first, filed in 2005, she averred (all spelling, punctuation, and/or grammatical errors are in the original):

I, Sylvia Andrews, was appointed . . . to represent [Petitioner] after grievances were filed by [Petitioner] against his then current attorneys. I was appointed in October. Due to the time factor, the bailiffs brought [Petitioner] immediately to the jury room

for the 371st District Court. (We would meet there several other times during the course of my preparation for trial in an effort to provide [Petitioner] a private, comfortable and quiet area to assist me in his defense. I met with [Petitioner] and explained that I had been appointed and that the Court had indicated to me that the trial would continue as planned. We had a lengthy and pleasant visit. He seemed pleased that I would be representing him and understood that with a December trial date we had much to do. I informed him that I had reviewed the clerks' file containing motions that had been filed earlier, that they were in order, and that I would be adopting those motions. He understood and agreed. [Petitioner] was a very bright individual (he had been in management with Taco Bell) and had a well thought-out plan for his defense . . . but that was the problem, because he didn't really have a defense nor did he have an alibi. I explained to [Petitioner] my most important concern about his defense: he would have to take the stand. We talked at length about the pros and cons of testifying. Finally, [Petitioner] agreed that as a strategy for trial and for appellate purposes he would assert his 5th amendment right to remain silent. [Petitioner] had a very convoluted and ever-changing explanation for perhaps the biggest hurdle we faced, besides the dead injured party: his keys were found in the living room, a few feet from the deceased.

It was no secret that [Petitioner] was involved in selling illegal drugs, though he was not a drug user. It was a business that was incredibly more profitable than training future taco sellers. The State's case was this was simply "a drug deal gone bad". [Petitioner] at times insisted he was not there and on other occasions that he was and his keys somehow got left behind. Each time we would meet he would have recalled some new and critical piece of information. That was problematic on several fronts. First, it was becoming clear that it would be difficult to trust [Petitioner] and even more troublesome if he ever were to take the stand. Second, it was almost impossible to verify anything he said. Finally, it was a real impediment to preparation of a trial strategy with the ephemeral defense(s) he offered. In the end, I suggested that he could remember whatever he wanted just get one memory and stick with it.

During the trial, if I did anything wrong it would be that I listened to [Petitioner]. He was difficult during the entire trial. He was constantly writing notes with specific questions to things, by the way, that I was hearing for the first time from him. He would whisper in my ear, if I ignored his notes. It was very difficult to ask questions and/or make timely and legal objections when he was in my ear, not only telling me what he wanted done, but why and how it was central to something new he had just remembered. He was out of control. At one point, I asked for a recess to find out what-the-heck he was talking about. Well, not only had it come to him how his keys got to the crime scene, but he wanted to take the stand. I was stunned. (But I probably shouldn't have been). Not only did he want to take the stand with a story I had not heard, but it was the most cockamamie thing one could imagine. At that point, I was sure that I couldn't believe a word coming from this guy's mouth. I didn't want to

solicit untrue statements and I really didn't want to lose what credibility we had with the jury. Without the jury present, I put him on the sand and went over our previous plan for him to not testify. He explained to the court that he had changed his mind. He admitted that it was against the advice of counsel. And off we went to prepare for his direct examination later that afternoon, when he would have the opportunity to tell the jury that he had been there earlier from somewhere and dropped his keys on his way out going to wherever. It was the kind of story that's hard to remember because not one word of it rang true. It was embarrassing for everyone. I don't think the State kept him on the stand 5 minutes. The jury was back in half an hour.

I made one other mistake. In my effort to be effective in representing [Petitioner], I empowered him. And it probably ended up being the thing that, ultimately, did him in. And those keys didn't help things much either.

SH03 Writ 66-67, ECF No. 15-1.

In the second, supplemental affidavit, filed in 2010, counsel averred:

After reviewing the attached writ, there is little to be added on my part. [Petitioner] continues to have his own unique recollection of the facts related to his trial. I will reiterate that at no time did I encourage or coerce [Petitioner] to testify. It was only after the State had presented its case that he determined he wanted to testify. His taking the stand, in fact, was something I discouraged. The final decision regarding his testimony was his, despite my recommendations.

Finally, with regard to [Petitioner]'s handwritten notations on my original affidavit I find them argumentative and without substance. With regard to his complaints regarding the dates of appointment, pretrials, etc., the docket can be reviewed. As to his assertions of contradiction and misrepresentation of events within my affidavit, I submit these are his opinion, to which it is impossible for me to respond.

SH10 Writ 73, ECF No. 15-8.

Under his first ground, Petitioner claims counsel was ineffective by failing to challenge three veniremen, Adamski, Smith, and Tello, for cause, resulting in the seating of a tainted jury. Pet. 6, ECF No. 3. Specifically, he asserts that Adamski was challengeable because she stated that she had emotional problems that would affect her substantially; Smith was challengeable because he stated that he had experience with gang members and would use his outside knowledge and experience in

his judgment; and Tello was challengeable because he stated that he was from Columbia, the most violent country in the world, full of gangs, and that he would give a police officer's testimony more credibility than a gang member's. *Id.*

The state habeas court found that, sixteen years after the fact, counsel could no longer recall why she did not strike the jurors but that there was no evidence in the record that the jurors were challengeable for cause under article 35.16 of the Texas Code or Criminal Procedure. SH10 Writ 332-38. Specifically, the court entered the following relevant findings of fact regarding this issue:

81. Hon. Andrews' initial defense was to attack the credibility of the State's witnesses' investigation.

82. At the time of voir dire, Hon. Andrews did not anticipate that [Petitioner] would testify.

83. The witnesses Hon. Andrews planned to call were not gang members, drug dealers, or drug users.

84. The only gang members, drug dealers, and drug users Hon. Andrews anticipated during voir dire would testify were the State's witnesses.

85. It is reasonable that having jurors questioning the credibility of gang members, drug dealers, or drug users would have helped Hon. Andrews prepared defense because she was attacking the State's witnesses' credibility.

86. At the time of the writ hearing, sixteen years after the fact, Hon. Andrews could not recall why she did not strike Juror Adamski or ask her any questions.

87. Juror Adamski stated that she could not judge other people.

88. Juror Adamski's hesitation to judge other people would be a benefit to [Petitioner].

89. Juror Adamski stated that she "could look at the facts and try to reason them out."

90. Juror Adamski admitted that she "would have a[n] emotional side . . . that would be there."

91.     Juror Adamski stated that she would "give it [her] best shot" to try the case.

92.     There is no evidence in the record that Juror Adamski was biased or prejudiced against [Petitioner].

93.     There is no evidence that Juror Adamski had a bias or prejudice against any of the law applicable to the case.

        . . .

102.    There is no evidence, or allegation, that Juror Adamski had already predetermined the outcome of this case.

        . . .

105.    There is no evidence that Juror Adamski was challengeable for cause.

106.    There is no evidence that Hon. Andrews' representation was deficient because she did not challenge Juror Adamski for cause.

107.    There is no evidence that the outcome of the proceeding would have been different had counsel challenged Juror Adamski for cause.

        . . .

109.    Juror Smith testified that he works with ex-gang members and current gang members.

110.    Juror Smith stated that his knowledge of gangs and work would affect him in forming an opinion.

111.    Juror Smith stated that he would not share his personal knowledge on gang membership with the other jurors.

112.    Juror Smith stated that he would keep his personal knowledge to himself but would use it in his judgment.

113.    Juror Smith did not state how his personal work with gang members would affect his opinion.

114.    Juror Smith did not state how he felt about gang members.

115.    There is no evidence in the record that Juror Smith was biased or prejudiced

against [Petitioner].

116.    There is no evidence that Juror Smith had a bias or prejudice against any of the law applicable to the case.

. . .

125.    There is no evidence, or allegation, that Juror Smith had already predetermined the outcome of this case.

. . .

128.    There is no evidence that Juror Smith was challengeable for cause.

129.    There is no evidence that Hon. Andrews' representation was deficient because she did not challenge Juror Smith for cause.

130.    There is no evidence that the outcome of the proceeding would have been different had counsel challenged Juror Smith for cause.

. . .

132.    Juror Tello admitted that he was "probably going to give more weight to the police officer's testimony than the gang member" if both testified.

133.    Juror Tello did not state that he would give more weight to the police officer's testimony.

134.    Juror Tello did not state that he would definitely be prejudiced against [Petitioner] if he was shown to be a gang member.

135.    Juror Tello did not state that he would definitely give more credibility to a police officer's testimony than a gang member.

136.    Juror Ketcher, and not Juror Tello, advised that he would give more credibility to a police officer than a teenager.

137.    Juror Ketcher was struck for cause.

138.    There is no evidence in the record that Juror Tello was biased or prejudice[d] against [Petitioner].

139.    There is no evidence that Juror Tello had a bias or prejudice against any of

the law applicable to the case.

. . .

148.    There is no evidence, or allegation, that Juror Tello had already predetermined the outcome of this case.

. . .

151.    There is no evidence that Juror Tello was challengeable for cause.

152.    There is no evidence that Hon. Andrews' representation was deficient because she did not challenge Juror Tello for cause.

153.    There is no evidence that the outcome of the proceeding would have been different had counsel challenged Juror Tello for cause.

SH10 Writ 332-38, ECF No. 15-9 (record citations omitted).

Based on its findings, and applying the *Strickland* standard, the state court concluded that jurors are free to apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving the effect to inferences that may be reasonably drawn from the evidence and that Petitioner failed to prove the three jurors were challengeable for cause or that counsel's representation was deficient because she did not challenge the jurors. *Id.* at 363-66. Deferring to the state courts' factual findings, the state courts' application of *Strickland* was not unreasonable. Conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue. *Miller v. Johnson,* 200 F.3d 274, 282 (5th Cir. 2000); *Ross v. Estelle,* 694 F.2d 1008, 1011 (5th Cir. 1983).

Under his fourth ground, Petitioner claims counsel was ineffective by failing to request an accomplice-witness instruction pertaining to the testimony of state witnesses Stephen Mays, whose car was used by Petitioner and Johnson on the night in question, and Arthur Porter, who gave

Petitioner and Johnson a ride to Johnson's house after the murder. Reporter's R., vol. 6, 319-20. Under state law, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14 (West 2005). An accomplice is a person who participates in the offense to the extent that he can be charged with the offense. *Herron v. State,* 86 S.W.3d 621, 631 (Tex. Crim. App. 2002). A prosecution witness who has been indicted for the same offense as the defendant is an accomplice as a matter of law, and an instruction under article 38.14 is required. *Id.*

The state habeas court entered the following relevant findings of fact regarding this issue:

255. Marcus Johnson did not testify at [Petitioner]'s trial.

256. Hon. Andrews does not recall whether she considered Stephen Mays an accomplice as a matter of law.

257. Mays testified that he traded cars with [Petitioner] because [Petitioner]'s car was nicer and he wanted to drive it.

258. Mays testified that he was upset at [Petitioner] and Marcus Johnson for using his car during the course of this offense.

259. Mays refused to participate in any jacking.

260. There is no evidence that Mays gave [Petitioner] his car to promote, assist, solicit, encourage, direct, aid, or attempt to aid [Petitioner] in the commission of capital murder.

261. [Petitioner] called Mays and told him that they lost the keys to his car and he needed to come get it.

262. When Mays returned to his car, there was a pager, an orange bag with a camera in it, and trash left behind.

263. Mays pawned the camera in the orange bag.

264.  Mays did not know who the camera belonged to or where it came from.

265.  There is no evidence that Mays was an accomplice to the capital murder offense as a matter of law.

266.  Hon. Andrews does not recall whether she considered Arthur Porter an accomplice as a matter of law.

267.  Porter testified that he received a page from [Petitioner] on the night of the murder saying he needed a ride to Marcus Johnson's home.

268.  Porter testified that [Petitioner] did not say why they needed a ride when [Petitioner] asked.

269.  Porter testified that he picked up [Petitioner] and Marcus Johnson at Pebble Creek Apartments and not the location of the offense.

270.  Porter testified that [Petitioner] and Marcus Johnson left the location of the offense on foot and went to Marcus' girlfriend's house who then gave them a ride to Pebble Creek.

271.  There is no evidence that Porter knew [Petitioner] and Marcus Johnson had just committed capital murder when he picked them up at the Pebble Creek Apartments.

272.  There is no evidence that Porter picked up [Petitioner] and Marcus Johnson from the Pebble Creek Apartments to promote, assist, solicit, encourage, direct, aid, or attempted to aid [Petitioner] in the commission of the capital murder.

273.  Porter testified that [Petitioner] and Marcus showed him a nine millimeter gun, watches, and a ring that was property taken from the victim's home.

274.  There is no evidence that Mays was an accomplice to the capital murder offense as a matter of law.

SH10 Writ (Part 2) 347-48, ECF No. 15-9 (record citations omitted).

Based on its findings, the state court concluded that Petitioner failed to prove that Mays and

Porter could be prosecuted for the offense or that they were accomplice witnesses as defined by §

7.02 of the Texas Penal Code; thus, Petitioner failed to prove counsel should have requested

accomplice-witness instructions regarding their testimony. *Id.* at 368-69. Deferring to the state courts' factual findings, the state courts' application of *Strickland* was not unreasonable. Counsel is not required to make frivolous or futile motions or objections. *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002); *Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir. 1990).

Under his fifth ground, Petitioner claims counsel was ineffective by failing to request an extraneous-offense instruction requiring the jury to find the existence of extraneous offenses beyond a reasonable doubt pertaining to extraneous-offense evidence that he was involved in an attempted murder, deadly conduct, a hit and run, evading arrest, possession of stolen property, possession of a firearm, drug dealing, and gang membership. Pet. 11, ECF No. 3. The state habeas court entered the following relevant findings of fact on this issue:

302.  Hon. Andrews acknowledged pre-trial that she received notice of the State's intent to introduce extraneous offense evidence of attempted murder, deadly conduct, hit-and-run, evading arrest, possession of stolen property, possession of a firearm, drug dealing, and gang membership.

303.  The State put on evidence that this murder was motivated by [Petitioner]'s gang affiliation with the Rolling Sixties Crip Set.

304.  Joy Avery testified that [Petitioner] was in a gang called the Rolling Sixties.

305.  Hon. Andrews objected to any evidence of [Petitioner]'s gang involvement because he was not charged with engaging in organized crime.

306.  Arthur Porter testified that [Petitioner] and Marcus Johnson referred to killing the victim as "putting in work."

307.  Porter testified that "putting in work" is a gang term for doing a criminal act.

308.  Officer Herman T. Young explained that "putting in work" is going out and killing a rival gang member or someone in the name of that gang.

309.  Officer Young testified that one can be elevated in a gang by "putting in work."

310. The extraneous offense evidence that [Petitioner] was a gang member was evidence of motive.

311. Officer Richard Lopez of the Shreveport Police Department attempted to pull over a four-door bronze vehicle for a missing taillight.

312. The vehicle contained three black males.

313. The vehicle did not stop, continued going down the street, and careened into a garage.

314. The driver of the vehicle and the rear passenger bailed out of the car and were never apprehended.

315. Columbus Jack was the only person Officer Lopez apprehended and he was a passenger so Officer Lopez let him go.

316. Officer Lopez did not identify [Petitioner] as the driver of the vehicle that did not stop or hit the garage.

317. Officer Lopez confiscated a semiautomatic, blue steel Taurus pistol (State's Exhibit 31A) that was in the back seat of the vehicle.

318. Billy Steadham identified the gun found in the abandoned vehicle in Shreveport as the one that was taken during the capital murder.

319. [Petitioner]'s fingerprints were recovered from the car abandoned in Shreveport.

320. Marcus Johnson's fingerprints were recovered from the car abandoned in Shreveport.

321. [Petitioner]'s receipt for Discount Tire was found in the car abandoned in Shreveport.

322. Mays identified the car abandoned in Shreveport as his car.

323. The evidence of extraneous offenses in Shreveport, Louisiana, was to prove identity by connecting [Petitioner] to both the keys found in the victim's home and the gun found in the abandoned car that was stolen from the victim's home.

324. Officer Acosta collected the bullet from the Ronald Allen shooting.

325. Carl Lee Henderson testified that he was standing next to [Petitioner] and saw him shoot Ronald Allen.

326. Henderson recognized the gun [Petitioner] used as one he'd seen in [Petitioner]'s possession ten to fifteen times.

327. The State indicated prior to opening statement that it intended to go into the attempted murder of Ron Allen because the projectiles removed from that crime scene matched the projectiles taken from the body in this case; thus, the same weapon was used in both offenses.

328. The extraneous offense evidence that [Petitioner] shot Ron Allen was admitted at trial to prove [Petitioner]'s identity in this offense because the same weapon was used.

329. The jury charge included the following extraneous offense instruction:

"The defendant is on trial solely on the charge contained in the indictment. In reference, if any, that the defendant has previously participated in a shooting on December 20, 1994 of an individual named Ronald Allen, if any, you are instructed that you cannot consider this act, if any, for any purpose unless you find and believe beyond a reasonable doubt that the defendant intentionally shot Ronald Allen with a deadly weapon, to wit a firearm; and even then you may only consider this action for the purpose of determining the identity of the person or persons who shot Robert Phelan, if it does, and for no other purpose."

330. Hon. Andrews does not recall how the extraneous instruction regarding. Ronald Allen's shooting was included in the court's instruction.

331. Hon. Andrews does not recall why she did not ask for a more general extraneous offense jury instruction.

332. It is possible that Hon. Andrews requested a general instruction and the parties agreed on the jury instruction as given.

333. It is possible that Hon. Andrews made a strategic decision to not request a general extraneous offense instruction because she did not want to highlight the other offenses.

334. The attempted murder extraneous offense was the offense most similar to the present offense.

335. There is no evidence that Hon. Andrews' representation was deficient because the jury was not given a general extraneous offense instruction.

SH10 Writ (Part 2) 350-53, ECF No. 154-9 (record citations omitted).

In Texas, "[t]he jury is entitled to know all relevant surrounding facts and circumstances of the charged offense." *Devoe v. State,* 354 S.W.3d 457, 459 (Tex. Crim. App. 2011). Further, under state evidentiary rule 404(b), extraneous offense evidence may "be admissible [to prove] motive, opportunity, intent, preparation, plan knowledge, identify, or absence of mistake or accident." TEX. R. EVID. 404(b). Based on its factual findings and relevant state law, and applying the *Strickland* standard, the state court entered the following legal conclusions:

59. Counsel received proper notice of the State's intent to use extraneous offense evidence.

60. Counsel properly objected to the State's intent to use extraneous offense evidence.

61. The evidence of gang membership was used as proof of motive for the capital murder; that is, to gain respect in the gang.

62. The evidence of the evading arrest, hit and run, and possession of a firearm in Shreveport, Louisiana, was used as proof of identity because it tied [Petitioner] to the keys found in the victim's home and the gun stolen from the victim's home that was found in the abandoned vehicle.

63. The evidence of the attempted murder was used as proof of identity because [Petitioner] used the same gun in the commission of both offenses.

64. "If a defendant, during the guilt/innocence phase, asks for an instruction to the jury on the standard of proof required for admitting extraneous offenses, the defendant is entitled to that instruction."

65. [Petitioner] has failed to prove that the lack of a general extraneous offense jury instruction was the result of deficient representation.

66. [Petitioner] has failed to prove that counsel's representation fell below an objective standard of reasonableness.

SH10 Writ (Part 2) 370-71, ECF No. 15-9 (citations omitted).

Deferring to the state courts' factual findings, the state courts' application of *Strickland* was not unreasonable. The claim as it pertains to the extraneous-offense evidence of the attempted murder of Ron Allen shooting is refuted by the record. The claim as it pertains to counsel's failure to request a general extraneous-offense instruction is conclusory. Petitioner fails to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Nor has he shown a reasonable probability that had such an instruction been requested and granted, he would not have been found guilty given the substantial evidence of his guilt.

Under his sixth ground, Petitioner claims counsel was ineffective by failing to object to admission of "perjurious" out-of-court statements by his co-defendant to Detective Thomas Lenoir as a violation of the Confrontation Clause under *Crawford v. Washington,* 541 U.S. 36 (2004), and *Bruton v. United States,* 391 U.S. 123 (1968). Pet. 11, ECF No. 3; Pet'r's Mem. 16-17, ECF No. 4. The state habeas court entered the following relevant findings of fact regarding this issue:

275. Detective Lenoir testified that Marcus Johnson provided information that corroborated the information from Arthur Porter, Billy Steadham, and Stephen Mays.

276. Detective Lenoir testified that Marcus Johnson identified the keys found at the crime scene.

277. Detective Lenoir testified that Marcus Johnson mentioned a trip to Shreveport.

278. Detective Lenoir testified that Marcus Johnson identified the property that Lenoir received from [Johnson's girlfriend] Tana Sherman.

279. Detective Lenoir testified that Marcus Johnson identified the mobile phone on his person as one taken from the victim's apartment.

280. Detective Lenoir testified that Marcus Johnson confirmed that the nine

millimeter had been left in the car in Shreveport.

281. Detective Lenoir testified that Marcus Johnson indicated that [Petitioner] was the person that fired the shots in this case.

282. Detective Lenoir's testimony regarding the information obtained from Marcus Johnson was admitted to explain how [Petitioner] became a suspect.

State Writ (Part 2) 349, ECF No. 15-9 (record citations omitted).

Under Texas evidentiary law, out-of-court statements by another witness presented to explain how the defendant became a suspect and was ultimately arrested is admissible because they are not admitted to prove the truth of the matter asserted, but rather to explain how the defendant became a suspect. *See Jones v. State,* 843 S.W.2d 487, 499 (Tex. Crim. App. 1992), *cert. denied,* 507 U.S. 1035 (1993). Thus, based on its factual findings and relevant state law, and applying the *Strickland* standard, the court concluded that—

47. Detective Lenoir's testimony regarding what information he got from Marcus Johnson was proper to show that Marcus Johnson corroborated information from other witnesses and demonstrated to the jury how [Petitioner] ultimately became the suspect.

48. [Petitioner] has failed to prove that Detective Lenoir's testimony was inadmissible hearsay.

49. [Petitioner] has failed to prove that counsel's representation was deficient because counsel did not object to Detective Lenoir's testimony.

*Id.* at 369 (citations omitted).

Deferring to the state courts' factual findings, and relying on the state court's application of state law, the state courts' application of *Strickland* was not unreasonable. The evidence was admitted for the limited purpose of explaining how Petitioner became a suspect in the case. The state courts' decision also comports with Fifth Circuit case law on the issue. *See United States v. Smith,*

822 F.3d 755, 762 (5th Cir. 2016) (providing no *Crawford* violation where out-of-court statements were introduced to show how law enforcement developed suspects, rather than for the truth of the matter asserted). Counsel is not required to make frivolous or futile objections. *Johnson,* 306 F.3d at 255; *Koch,* 907 F.2d at 527.

Finally, under his seventh ground, Petitioner claims that the cumulative effect of counsel's errors rendered his trial fundamentally unfair. Pet. 11, ECF No. 3. The state habeas court concluded that, in light of the overwhelming evidence of Petitioner's guilt, he failed to show a reasonable probability that the result of his trial would have been different but for counsel's omissions. *Id.* at 371. Deferring to the state courts' factual findings, the state courts' application of *Strickland* was not unreasonable. Petitioner failed to establish multiple instances of deficient performance to cumulate. And, the state courts correctly observed that the evidence of Petitioner's guilt was overwhelming. Thus, even if Petitioner could demonstrate deficient performance based on one or more of his claims, the weight of the evidence precluded him from demonstrating prejudice in state court. *See Pondexter v. Quarterman,* 537 F.3d 511, 524-25 (5th Cir. 2008), *cert. denied,* 555 U.S. 1219 (2009).

Petitioner's ineffective-assistance claims are insubstantial. Because Petitioner fails to establish ineffective representation by trial counsel under *Strickland,* his ineffective-assistance claims under grounds one, four, five, six, and seven, barred by laches in state court, are procedurally barred from this Court's review.

## V.  DISCUSSION

### A.  Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act,

a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The statute further requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear-and-convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, as in this case, it is an adjudication on the merits, which is also entitled to the presumption of correctness. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[1]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

---

[1]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

**B. Motion for Continuance**

Under his third ground, Petitioner claims that the state courts' findings and legal conclusions rejecting his allegation that the trial court abused its discretion by denying his motion for a continuance were "both contrary and unreasonable as set out under" § 2254(d)(1) and (2). Pet. 7, ECF No. 3. According to Petitioner, the state courts' rejection of the claim was unreasonable given that counsel was forced to go to trial only one month and two days after being appointed; counsel was going on vacation from November 27 through December 3, 1996; counsel's investigator was unavailable until December 2, 1996; counsel's inexperience with capital murder cases; counsel's overall unpreparedness for trial, including her failure to prepare Petitioner to take the stand; the voluminous nature of the state's file; the numerous witnesses; and the seriousness of the offense. Pet. 7, ECF No. 3; Pet'r's Mem. 10-14, ECF No. 4.

The state habeas court entered the following factual findings on the issue:

41.     On November 14, 1996, the trial court appointed Hon. Andrews as [Petitioner] requested.

42.     [Petitioner] was appointed his counsel of choice.

43.     On November 27, 1996, Hon. Andrews filed a motion for continuance because she was going to be unavailable for six days, her investigator was not available until December 2, 1996, and [Petitioner]'s case was set for trial on December 9, 1996.

44.     On December 9, 1996, Hon. Andrews initially indicated a desire to withdraw the motion for continuance because the trial court postponed the trial one week from December 9, 1996 to December 16, 1996.

45.     After Hon. Andrews advised the trial court that she was withdrawing the motion for continuance, [Petitioner] told her he did not want to withdraw the motion so she did not.

46.     Once Hon. Andrews reinitiated the motion for continuance, the trial court

denied it.

4 7.    The fact that Hon. Andrews initially withdrew the motion for continuance is evidence that she felt sufficiently prepared for trial.

48.    Hon. Andrews initially waived the motion for continuance during pretrial because the trial court moved the trial date ahead.

49.    Time did not help Hon. Andrews because she was dealing with an evolving story from [Petitioner].

50.    Based on how Hon. Andrews' investigation was going in this case, more time would only have led to more opportunities for them to spend time following unsuccessful trails.

51.    Hon. Andrews does not know of any additional information she could have discovered had she had additional time.

52.    Hon. Andrews felt she had sufficient time prior to trial to discuss with [Petitioner] whether he should testify.

53.    Hon. Andrews does not believe there were any other witnesses that [Petitioner] wanted her to seek out.

54.    Hon. Andrews believes she had all that was there available to them.

55.    Had [Petitioner] given Hon. Andrews names of more witnesses, her investigator was available to go out and interview them.

56.    If there was anything that would have come up from [Petitioner], Hon. Andrews would have sent her investigator out to investigate it.

57.    During the course of the trial, nothing new came up for Hon. Andrews or the investigator to investigate.

58.    [Petitioner] does not present any new information that Hon. Andrews would have discovered had she had additional time to prepare.

59.    [Petitioner] presents no evidence as to what additional evidence or information Hon. Andrews would have uncovered had she had more time to prepare for trial.

60.    There is no evidence that [Petitioner] was harmed by the amount of time Hon.

Andrews was given to prepare for trial.

61. The State rested its case-in-chief on day two of trial, December 18, 1996.

62. On day three, December 19, 1996, the trial court took up a matter at 9:32 am regarding a juror.

63. After the juror matter was taken up, the case was recessed from 9:41 am to 1:13 pm.

64. Hon. Andrews advised [Petitioner] that, based the evidence and testimony already presented, it was in his best interest to not call any witnesses and simply rest.

65. [Petitioner] advised Hon. Andrews at the time they decided to call their two witnesses to "wait and see" about whether he would testify.

66. At 1:13 pm, trial resumed and Hon. Andrews called [Petitioner]'s first witness.

67. The trial court recessed the trial after [Petitioner]'s two witnesses for over one hour.

68. [Petitioner] indicated, on the record, a desire to testify after the one hour recess.

69. It is reasonable that the trial court recessed for the hour to allow Hon. Andrews time to consult with [Petitioner] regarding his new desire to testify.

70. Hon. Andrews did not prepare for [Petitioner] to testify because it was not planned that he would testify in light of the evidence, witnesses, and the nature of the offense.

71. Hon. Andrews requested additional time to prepare [Petitioner] to testify.

72. The trial court denied any further recesses or time to prepare because it felt that [Petitioner] was "playing games with [the] Court."

73. The trial court was not happy with [Petitioner] and felt like he was gaming the system.

74. The trial court concluded that [Petitioner] had sufficient amount of time to decide whether he was going to testify.

75. There is evidence that the trial court was losing its patience with [Petitioner].

76. It is reasonable that the trial court concluded that [Petitioner] was playing games with the Court based on its personal dealings with [Petitioner].

77. In light of the fact that the trial had been recessed most of the day already and the trial court felt that [Petitioner] was just playing games, the trial court's decision to not grant any further continuances or recesses was reasonable.

78. There is no evidence as to how [Petitioner]'s testimony would have been different had counsel been allowed additional time to prepare him.

79. There is no evidence that the outcome of the proceeding would have been different had counsel been given more time to prepare.

80. There is no evidence that [Petitioner] was harmed by the amount of time Hon. Andrews was given to prepare.

State Writ (Part 2) 329-332, ECF No. 15-9 (record citations omitted).

Based on its factual findings, state law, and the documentary record, the state court entered

the following legal conclusions:

100. The granting of continuance is a matter vested in the sound discretion of the trial court.

101. Appointed counsel is entitled to ten days to prepare for a criminal proceeding [under article 1.051(e) of the Texas Code of Criminal Procedure].

102. [Petitioner]'s counsel received the more than the statutorily required 10 days.

103. Twenty-four days preparation time for a capital murder case has been held accurate.

104. An applicant "must prove by a preponderance· of the evidence that the error contributed to his conviction or punishment."

105. [Petitioner] has failed to prove that counsel needed more time to prepare for trial.

106.    [Petitioner] has failed to prove that he was harmed by the amount of time counsel was given to prepare for trial.

107.    [Petitioner] has failed to prove by a preponderance of the evidence that the amount of time provided to counsel to prepare for trial contributed to his conviction or punishment.

*Id.* at 374-75 (citations omitted). The Texas Court of Criminal Appeals, adopting the habeas court's findings, denied relief.

Deferring to the state courts' factual findings, and relying on the state court's interpretation of state law, the state courts' adjudication of the claim is not contrary to federal law as established by the United States Supreme Court or unreasonable in light of the facts before the state courts. When a denial of a continuance is the basis for a habeas petition, the petitioner must show an abuse of discretion that was so arbitrary and fundamentally unfair as to violate constitutional principles. *Newton v. Dretke,* 371 F.3d 250, 255 (5th Cir. 2004). Here, Petitioner's insistence that counsel pursue a continuance appeared dilatory and contrived and he wholly fails to establish a reasonable probability that the granting of a continuance would have benefitted his defense, resulted in an alternative defensive strategy, or permitted him to adduce evidence that would have altered the jury's verdict. *See McFadden v. Cabana,* 851 F.2d 784, 788 (5th Cir. 1988). Petitioner is not entitled to relief under his third ground.**VI. CONCLUSION**

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED** and a certificate of appealability is **DENIED**.

**SO ORDERED** on this 4th day of April, 2018.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**